## **AFFIDAVIT OF JARRED M. MATYKA**

I, Jared M. Matyka, being sworn, state:

### **INTRODUCTION**

Agent Background

1. I am a Special Agent with the United States Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and am currently assigned to the United States Drug Enforcement Administration ("DEA") Manchester, New Hampshire District Office. Prior to my assignment with the DEA, I was assigned to the HSI Boston Gang Unit, as well as several investigative groups in HSI Newark, New Jersey, where I was responsible for conducting narcotics investigations.

2. As an HSI Special Agent, I am authorized to investigate federal crimes, including violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have been a Special Agent with HSI for approximately thirteen years. In my investigative experience, I have conducted physical surveillance, executed search and arrest warrants, conducted interviews, and worked with cooperating individuals. As part of my training, I have graduated from the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program, as well as the HSI Special Agent Basic Training. In addition, during my time as a criminal investigator, I have completed several in-service training courses focused on narcotics and gang investigations.

3. During my employment with HSI, I have participated in numerous investigations relating to the distribution of controlled substances, including heroin, fentanyl, oxycodone, cocaine, and other substances in violation of the federal anti-drug laws. Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the

distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.

## Purpose of Affidavit

4. I submit this affidavit in support of an application for a criminal complaint charging Fabio Yunior MORETA-BORGE, a/k/a "Kakito," with distribution of and possession with intent to distribute 40 grams or more of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi) on January 21, 2020 and February 7, 2020.

5. I have personally participated in this investigation since June 2019. I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.

6. Because this affidavit is submitted for the limited purpose of establishing probable cause for the issuance of the requested criminal complaint, I have not included each and every fact known to me or other law enforcement officers involved in this investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the requested complaint. Nor do I request that this Court rely on any facts not set forth herein in reviewing these applications. All times herein are approximate.

## **PROBABLE CAUSE**

### Background of the investigation

7. In late June 2019, Fabio MORETA-BORGE called a DEA confidential informant ("CI") and asked the CI to recruit fentanyl customers for him. The CI knew MORETA-BORGE

by the nickname "Kakito" and knew him to be a drug distributor. Approximately one week after this unrecorded phone call, the CI met with DEA investigators and described MORETA-BORGE. The CI has a pending criminal case, and is cooperating with law enforcement in exchange for consideration in his/her pending criminal case. The CI otherwise has no criminal history. The CI is willing to testify, if necessary. The information provided by the CI has been corroborated to the extent possible, and I believe the information provided by the CI is reliable.

8. The following day, the CI brought investigators to Alex's Barbershop in Lawrence, Massachusetts (hereinafter, "the barbershop"), where investigators observed MORETA-BORGE's vehicle parked in the rear of the barbershop. The CI stated that MORETA-BORGE hangs out at the barbershop and deals drugs from there. Investigators and the CI waited for MORETA-BORGE to leave the barbershop and enter his vehicle. While investigators were following MORETA-BORGE, a Lawrence Police Officer stopped him and identified him through a driver's license.

9. On August 1, 2019, the CI placed a recorded call to MORETA-BORGE to arrange the purchase of a bulk-quantity of fentanyl. The CI and MORETA-BORGE made arrangements to meet in person at a later date. The conversations between the CI and MORETA-BORGE are primarily in Spanish, and conversations were monitored by a Spanish speaking investigator.

10. On August 7, 2019, in anticipation of the CI meeting with MORETA-BORGE, investigators searched the CI and the CI's vehicle for contraband, money, or weapons with negative results. Investigators also equipped the CI with an audio/video recording and monitoring device. In a recorded phone call, the CI and MORETA-BORGE agreed to meet at the Family Dollar store at 700 Essex Street in Lawrence, Massachusetts. MORETA-BORGE stated

to the CI that he was already at the store. Investigators established surveillance of the Family Dollar store prior to the CI's arrival. At 1:02 p.m., a surveillance unit observed MORETA-BORGE's vehicle stopped near the Family Dollar store with its brake lights on. A few minutes later, MORETA-BORGE pulled into a parking space near the Family Dollar and parked. Around the same time, the CI arrived in the CI's vehicle near the Family Dollar store. MORETA-BORGE exited his car and entered the front passenger seat of the CI's vehicle. The CI then pulled into a parking space outside the Family Dollar store and parked.

11. A surveillance investigator could hear the conversation between the CI and MORETA-BORGE utilizing the audio monitoring device worn by the CI. MORETA-BORGE asked the CI when the CI "could do it," meaning the fentanyl transaction. The CI informed MORETA-BORGE that he/she needed to get the money, and asked MORETA-BORGE if the price was still $160, meaning $160 per "finger," or ten grams, a common distribution amount for fentanyl. MORETA-BORGE confirmed the price to be $160. The CI and MORETA-BORGE then agreed to meet later in the afternoon after the CI could obtain the funds. After this conversation, MORETA-BORGE exited the CI's vehicle and left the area.

12. A few minutes after observing MORETA-BORGE leave the Family Dollar parking lot, investigators observed MORETA-BORGE's vehicle parked outside of the barbershop, a short distance from Family Dollar. Minutes later, investigators observed MORETA-BORGE walk briefly into a nearby appliance store, and then sit outside the barbershop for several minutes.

13. Meanwhile, at 2:00 p.m., investigators met with the CI and searched the CI again for contraband, currency, and weapons with negative results. Investigators provided the CI with $960 of recorded agency funds in order to purchase six "fingers" or 60 grams of fentanyl from

MORETA-BORGE. Shortly thereafter, MORETA-BORGE called the CI and asked how long the CI would take. MORETA-BORGE advised the CI that his fentanyl was in loose powder form, and not compressed into "fingers." This phone call was overheard on the CI's audio monitoring device. Around this time, a surveillance unit observed MORETA-BORGE driving in the vicinity of his residence at 22 Brookfield Street in Lawrence (hereinafter, "Brookfield Residence").

14. At 2:09 p.m., the CI called MORETA-BORGE to arrange a meeting for the controlled purchase. MORETA-BORGE stated that he needed 20 minutes to get ready, and told the CI that he was "getting the cortina" (Spanish slang for cutting agent or diluent for controlled substances). MORETA-BORGE inquired of the CI whether it was "safe" to talk on the CI's phone. Based upon my training and experience, I believe that MORETA-BORGE was wary of law enforcement intercepting phone calls and making recordings.

15. The surveillance unit watching MORETA-BORGE observed him park in the driveway of the Brookfield Residence. Minutes later, MORETA-BORGE moved his vehicle from the driveway to the street. At 2:35 p.m., another Spanish speaking investigator listening to the audio monitoring device, advised that the CI and MORETA-BORGE spoke on the phone and agreed to meet again at the Family Dollar parking lot in approximately 10 minutes. MORETA-BORGE advised the CI that he was in the area of Andover Street in South Lawrence, a short distance from the Brookfield Residence.

16. At 2:42 p.m., the CI left for the Family Dollar parking lot, under the observation of surveillance units. At 2:52 p.m., the CI's audio/video recording and monitoring device malfunctioned. However, in order to preserve this ongoing investigation, the planned controlled purchase was allowed to continue. At 3:01 p.m., a surveillance unit observed MORETA-BORGE leave the Brookfield Residence in his vehicle and travel towards the Family Dollar store. At 3:07

p.m., the CI advised investigators during debriefing that MORETA-BORGE called and instructed the CI to go to 24 Medford Street in Lawrence to complete the drug transaction. The CI did as instructed by MORETA-BORGE. According to the CI, once the CI arrived at 24 Medford Street, MORETA-BORGE approached the CI's passenger side window and asked, "Are you ready?" MORETA-BORGE then passed a black box to the CI through the passenger window. In exchange, the CI handed MORETA-BORGE the $960 of recorded agency funds. MORETA-BORGE did not count the money, and told the CI, "Call me." At 3:11 p.m., a surveillance unit observed MORETA-BORGE drive away.

17. A surveillance unit followed MORETA-BORGE to Cash Zone Inc., located across the street from the barbershop. Cash Zone Inc. is a money transfer service. Based upon my training and experience, drug traffickers often use money transfer services to remit drug proceeds to co-conspirators in other countries or other parts of the United States. Based upon my training and experience, I believe that MORETA-BORGE was remitting the funds received from the CI to his co-conspirators. After a few minutes inside Cash Zone Inc., MORETA-BORGE walked across the street and went into the barbershop. Surveillance was thereafter terminated.

18. After the controlled purchase, other investigators followed the CI to a pre-determined meeting location. The CI directed investigators to a black box on the CI's passenger seat. An investigator opened the box and observed a large clear bag that contained six smaller individual plastic bags of an off-white loose powdery substance. Based upon my training and experience, the appearance, packaging, and pricing of the substance, I believe it is fentanyl. Due to the airborne hazards of fentanyl, the substance was not field tested. The suspected fentanyl was transported to the DEA Northeast Regional Laboratory, where analysis is pending.

August 22, 2019: Controlled Purchase of 78 grams of fentanyl from MORETA-BORGE

19.     On August 22, 2019, at 1:20 p.m., the CI, under the direction and supervision of investigators, spoke with MORETA-BORGE on the phone and negotiated the purchase of 70 grams of fentanyl for $1,120. At 1:35 p.m., MORETA-BORGE advised the CI that he would be ready in one hour. MORETA-BORGE further advised that he did not have the fentanyl pressed into fingers, but would have it in one "ball," meaning loose powder. The CI advised that the CI would take the fentanyl in loose powder form. At 1:41 p.m., a surveillance officer observed MORETA-BORGE leave the Brookfield Residence and travel to a business on Canal Street. Thereafter, MORETA-BORGE returned to the Brookfield Residence. MORETA-BORGE then advised the CI to meet on Medford Street in Lawrence. Surveillance officers followed MORETA-BORGE from the Brookfield Residence to Medford Street. Prior to leaving to meet with MORETA-BORGE, investigators searched the CI for contraband with negative results. Investigators then equipped the CI with an audio recording and surveillance device and $1,120 in recorded funds.

20.     When the CI arrived on Medford Street, investigators observed MORETA-BORGE approach the CI on foot and enter the CI's vehicle. Inside the vehicle, MORETA-BORGE provided a ball of plastic wrap containing fentanyl to the CI. The CI provided the $1,120 of recorded funds to MORETA-BORGE. MORETA-BORGE then exited the CI's vehicle and the CI returned to a pre-determined meeting location. At the meeting location, the CI provided investigators with the fentanyl. Investigators then searched the CI for contraband with negative results. The substance was delivered to the DEA Northeast Regional Laboratory, where it was determined to be 78 grams of a substance containing fentanyl.

21.     Meanwhile, other investigators observed MORETA-BORGE travel from the controlled purchase to the barbershop. MORETA-BORGE later called the CI complaining that he was underpaid. The CI apologized for the misunderstanding, reiterating that the CI had ordered 70 grams and only assumed any extra drugs (the extra 8 grams) provided in the loose form was free.

January 21, 2020: Controlled purchase of 60 grams of suspected fentanyl from MORETA-BORGE outside the barbershop

22.     On January 21, 2020, the CI, under the direction and supervision of investigators, placed a recorded call to MORETA-BORGE and negotiated the purchase of 60 grams of fentanyl for $1,050. MORETA-BORGE advised the CI that he would be ready in one hour. Approximately 45 minutes after the recorded call, investigators observed MORETA-BORGE driving on South Union Street in Lawrence. MORETA-BORGE then called the CI and directed the CI to the Brookfield Residence. Shortly thereafter, MORETA-BORGE again called the CI and changed the meeting location to the barbershop. Prior to leaving to meet with MORETA-BORGE, investigators searched the CI for contraband with negative results. Investigators then equipped the CI with an audio recording and surveillance device and $1,050 in recorded funds.

23.     When the CI arrived at the rear of the barbershop, investigators conducting surveillance observed MORETA-BORGE approach and enter the CI's vehicle. Inside the vehicle, MORETA-BORGE removed a plastic bag containing a brown powdery substance from his coat pocket and handed it to the CI. The CI provided the $1,050 of recorded funds to MORETA-BORGE. MORETA-BORGE then exited the CI's vehicle, and the CI returned to a pre-determined meeting location. At the meeting location, the CI provided investigators with the bag of suspected fentanyl. Investigators then searched the CI for contraband with negative

results. Based upon my training and experience, the packaging of the substance, and the nature of the transaction, I believe that the substance is fentanyl. The suspected fentanyl was not field tested. The substance was delivered to the DEA Northeast Regional Laboratory, where analysis is pending.

February 7, 2020: Controlled purchase of 50 grams of suspected fentanyl from MORETA-BORGE

24. On February 7, 2020, at 1:17 p.m., the CI, under the direction and supervision of investigators, placed a recorded call to MORETA-BORGE and negotiated the purchase of 50 grams of fentanyl for $900. At 1:35 p.m., MORETA-BORGE advised the CI that he had the product with him. Simultaneously, a surveillance officer observed MORETA-BORGE's vehicle idling in the driveway of the Brookfield Residence. MORETA-BORGE advised the CI that he would provide a meeting location when MORETA-BORGE was ready to meet. Thereafter, investigators observed MORETA-BORGE make several stops at various residences. At 2:31 p.m., MORETA-BORGE called the CI and directed the CI to the barbershop. Prior to leaving to meet with MORETA-BORGE, investigators searched the CI for contraband with negative results. Investigators then equipped the CI with an audio recording and surveillance device and $900 in recorded funds.

25. When the CI arrived at the rear of the barbershop, investigators observed MORETA-BORGE approach and enter the CI's vehicle. Inside the vehicle, MORETA-BORGE provided a plastic bag containing suspected fentanyl to the CI. The CI provided the $900 of recorded funds to MORETA-BORGE. MORETA-BORGE then exited the CI's vehicle and the CI returned to a pre-determined meeting location. At the meeting location, the CI provided investigators with the bag of suspected fentanyl. Investigators then searched the CI for

contraband with negative results. Based upon my training and experience, the packaging of the substance, and the nature of the transaction, I believe that the substance is fentanyl. The suspected fentanyl was not field tested. The substance was delivered to the DEA Northeast Regional Laboratory, where analysis is pending.

26. Other investigators maintained surveillance of MORETA-BORGE, who entered the barbershop using the rear entrance. Shortly thereafter, investigators observed MORETA-BORGE standing inside the barbershop near the front door while counting money.

<u>March 2, 2020: Interview and arrest of MORETA-BORGE</u>

27. On March 2, 2020, investigators approached MORETA-BORGE in an attempt to interview him regarding his drug trafficking activities, co-conspirators, and source(s) of drug supply. Investigators observed MORETA-BORGE in the area of the barbershop in the early morning hours, and waited for him to leave the area before approaching him. After providing MORETA-BORGE with his *Miranda* warnings, a Spanish-speaking investigator interviewed MORETA-BORGE about his drug trafficking activities. MORETA-BORGE indicated that he knew why he was being interviewed and knew the identity of the confidential informant, but declined to provide a name. MORETA-BORGE admitted his involvement with drug trafficking, indicated that he suspected law enforcement involvement in the aforementioned controlled purchases, but declined to provide information about his source(s) of drug supply. Based upon MORETA-BORGE's admissions, law enforcement placed MORETA-BORGE under arrest due to his risk of flight now that the investigation is overt.

## CONCLUSION

28. Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that on January 21, 2020 and

February 7, 2020, MORETA-BORGE distributed and possessed with the intent to distribute 40 grams or more of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi).  Accordingly, I respectfully request that a criminal complaint charging Fabio Yunior MORETA-BORGE with the aforementioned violations be issued.

Respectfully submitted,

_____
Jarred M. Matyka
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on March 2, 2020.

_____
Hon. Jennifer C. Boal
United States Magistrate Judge
District of Massachusetts